UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GROWBLOX SCIENCES, INC.,

                    Plaintiffs,

      – against –

GCM ADMINISTRATIVE SERVICES, LLC,
SETH M. LUKASH, GARY HERMAN, and
STRATEGIC TURNAROUND EQUITY
PARTNERS, LP (CAYMAN),

                    Defendants.

DIGITAL CREATIVE DEVELOPMENT
CORPORATION, GCM ADMINISTRATIVE
SERVICES, LLC, STRATEGIC TURNAROUND
EQUITY PARTNERS, LP (CAYMAN), SETH M.
LUKASH, and GARY HERMAN,

                    Counterclaimants,

      – against –

GROWBLOX SCIENCES, INC., TODD DENKIN,
JOSEPH J. BIANCO, TUMBLEWEED HOLDINGS,
INC. f/k/a GROWOPP HOLDINGS, INC., CRAIG
ELLINS, and GROWOPP, LLC,

                    Counterclaim-Defendants.

**<u>OPINION AND ORDER</u>**

14 Civ. 2280 (ER)

<u>RAMOS, D.J.</u>:

       Plaintiff GrowBlox Sciences, Inc. ("Growblox Sciences") brings this action against GCM

Administrative Services, LLC ("GCM"), Strategic Turnaround Equity Partners, LP ("Strategic"),

Seth M. Lukash ("Lukash"), and Gary Herman ("Herman") (collectively, "Defendants").  *See*

Am. Compl., Doc. 3.   Plaintiff seeks a declaratory judgment as to whether Defendants have a

right to convert certain debt instruments into shares of Growblox Sciences common stock,[1] pursuant to promissory notes which Strategic and GCM Administrative Services, LLC ("GCM") issued to an entity named GrowOpp, LLC ("GrowOpp LLC").  *Id.* at ¶¶ 2, 11, 12.

Defendants, along with Digital Creative Development Corporation ("DCDC") (collectively, "Counterclaimants"), filed counterclaims against Plaintiff, GrowOpp LLC, Craig Ellins ("Ellins"), Todd Denkin ("Denkin"), Joseph J. Bianco ("Bianco") and Tumbleweed Holdings, Inc. ("Tumbleweed") (collectively, "Counterclaim-Defendants").  Am. Countercl., Doc. 26.  Counterclaimants asserted five causes of action:  (1) declaratory relief that a general partnership was formed; (2) breach of fiduciary duty; (3) unjust enrichment; (4) quantum meruit; and (5) breach of contract.  *Id.*  Counterclaim-Defendants moved to dismiss the first four counterclaims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Counter-Def.'s Mot. Dismiss, Doc. 30.  The Court denied the motion with respect to the unjust enrichment and quantum meruit claims, but granted the motion with respect to the declaratory judgment and breach of fiduciary duty claims, dismissing those claims without prejudice.  Order, Doc. 44.

Counterclaimants now move for leave to file amended counterclaims.  *See* Doc. 50.  In addition to the surviving unjust enrichment and quantum meruit claims, Counterclaimants replead the declaratory judgment and breach of fiduciary duty claims.  Proposed Second Amended Counterclaims ("2d Am. Countercl."), Doc. 51-1.  Additionally, as an alternative to the breach of fiduciary duty claim, Counterclaimants plead that Denkin and Bianco aided and abetted Ellins's breach of fiduciary duty.  *Id.*  For the reasons set forth below, Counterclaimants' motion for leave to file amended counterclaims is GRANTED.

---

[1] Plaintiff filed its Amended Complaint under the name Signature Exploration and Production Corporation ("Signature").  Since then, Plaintiff has started operating under the name GrowBlox Sciences, Inc.  *See* Countercl., Doc. 11; Answer Countercl., Doc. 14 at 2.

## I.   BACKGROUND

### A.  Factual Background[2]

In February 2013, Counterclaim-Defendant Ellins reached out to Counterclaimant Herman with the idea to develop a business that would produce and sell legal cannabis products (the "Cannabis Business").  2d Am. Countercl. ¶ 15.  Although Ellins had some experience in the legal cannabis sector, he lacked the business experience necessary to launch the Cannabis Business.  *Id.* ¶¶ 15-16.  Ellins thus turned to Herman for financial expertise.  *Id.* ¶ 16.

Herman expressed interest in raising money for the business.  *Id.* ¶17.  Furthermore, as the CEO and President of a public company (DCDC), Herman could provide a corporate vehicle to offer securities and raise capital for the Cannabis Business.  *Id.*

In addition to Ellins and Herman, Counterclaimant Lukash and Counterclaim-Defendants Denkin and Bianco also became involved with the Business (collectively, the "Five Individuals").  *Id.* ¶ 18.  Lukash had served as the Chief Executive Officer and Chief Operating Officer of various technology and software companies, and had prior experience in manufacturing, industrial design, marketing, business strategy, and financial reporting.  *Id.* ¶ 19.  The Five Individuals thus agreed that Lukash should serve as Chief Executive Officer and as the "public face" of the Cannabis Business to assist with fundraising and licensing.  *Id.*  Denkin, like Ellins, had prior experience in the legal cannabis sector, as well as in marketing and design, and could help develop a business plan and investor presentations to support the parties' efforts to raise money.  *Id.* ¶ 20.  Finally, Bianco had experience with mergers and acquisitions and could contribute funds to the Business.  *Id.*

---

[2] The following factual background is based on the allegations in the Proposed Second Amended Counterclaims, Doc. 51-1, which the Court accepts as true for purposes of the instant motion.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  In addition, it cites documents which are incorporated by reference.  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citations omitted).

On July 31, 2013, the Five Individuals drafted a non-binding letter of intent ("LOI"), which memorialized the "structure to launch the Business as a public company." *Id.* ¶ 22. By its terms, the LOI described a "proposed transaction" whereby DCDC, GrowOpp LLC, and a company known as GrowBlox Holdings, Inc. would merge through the acquisition by DCDC of substantially all of the assets of GrowOpp LLC and GrowBlox Holdings, Inc. Am. Compl., Ex. H at 1. DCDC would then be renamed Growblox Holdings, Inc. ("Growblox Holdings"), and reincorporate in Delaware. 2d Am. Countercl. ¶ 22.

The LOI indicates that Growblox Holdings was to hold 60% of the company's shares, *id.* at 8, which Counterclaimants state was to be split evenly between the Five Individuals, 2d Am. Countercl. ¶ 22.[3] The remaining 40% of shares were designated for new investors and existing shareholders of DCDC. Am. Compl., Ex. H at 8. The LOI was signed by Herman on behalf of DCDC, Denkin, on behalf of GrowOpp LLC, and Lukash as "Chief Executive Officer" on behalf of Growblox Holdings, Inc.[4] *Id.* at 6.

The LOI expired by its own terms, ninety days after signing, on October 29, 2013, without the proposed transaction having taken place.[5] 2d Am. Countercl. ¶¶ 25-26. Notwithstanding the expiration of the LOI, the Five Individuals continued to work together in

---

[3] The LOI does not indicate whether the 60% of shares kept by Glowblox Holdings was to be divided evenly between the Five Individuals. For the purpose of deciding this motion, however, Counterclaimants' allegation that the shares were to be split evenly is taken as true. *Mackley v. Sullivan & Liapakis, P.C.*, No. 98 Civ. 4860 (SWK), 1999 WL 287362, at *3 n.2 (S.D.N.Y. May 7, 1999) ("Because the documents incorporated by reference and attached to the complaint do not contradict, but merely cast doubt on some of [Plaintiff's] allegations, the Court must accept those allegations as true.").

[4] The LOI describes GrowBlox Holdings, Inc. as a Delaware Corporation with its principal place of business in Henderson, Nevada. Am. Compl., Ex. H at 1. It is not a party to this litigation, however, and its management is nowhere described.

[5] The LOI contained a waiver of liability provision with respect to the parties and their representatives. Am. Compl., Ex. H ¶ 6. Although this a significant fact in this case, the waiver provision is not pertinent to the instant motion.

furtherance of the Cannabis Business for at least four months thereafter, until early March 2014. *Id.* ¶ 26.  Counterclaimants state that the Five Individuals ultimately formed "a *de facto* partnership and/or joint venture," and "it was understood and agreed that each of the Five Individuals would, in exchange for their efforts, acquire an equal 20% interest in the resulting Business, and would thus share equally in its profits."  *Id.* ¶¶ 26-27.  Furthermore, in "an early in-person meeting," Lukash stated to Herman, Ellins, Denkin, and Bianco that they would each be 20% owners, to which "everyone expressly agreed."  *Id.* ¶ 27.

From October 29, 2013 to early March 2014, the Five Individuals continued to work together to develop the Cannabis Business.  *Id.* ¶ 30.  Ellins and Denkin took the lead on the operations side of the Business, given their prior experience in the legal cannabis sector.  *Id.* ¶ 28.  This included work towards the development of the "GrowBLOX" product, a device intended to facilitate cannabis production.  *Id.*

Lukash worked closely with Ellins, as well as an engineer and design consultant hired to assist in developing GrowBLOX, to transform the product from "a rudimentary prototype built out of wood to a commercially-marketable product complete with sophisticated technologies." *Id.* ¶ 29.  Lukash made recommendations on the construction, design, packaging, and shipping of the product.  *Id.*  Lukash also, with the assistance of Herman, worked closely with Ellins, Denkin, and Bianco to create a business plan, create pro-forma financials, develop the corporate website, create investor presentations, and raise financing.  *Id.* ¶ 30.

Herman, meanwhile, took "all necessary steps" to deliver a "clean" corporate shell, in the form of DCDC, which could be used to acquire the Cannabis Business.  *Id.* ¶ 31.  This would ensure that "DCDC was ready to serve as the public acquisition vehicle for the Cannabis Business."  *Id.*

According to Counterclaimants, the Five Individuals "routinely consulted one another on all decisions affecting the Business" and "made important decisions affecting the Business jointly," such as changing the name of the Business and the style of the logo.  *Id.* ¶ 34. Throughout the time that they worked together, the Five Individuals regularly kept in contact, participated in meetings and conference calls, and sent regular emails and texts to update each other on the status of their efforts.  *Id.*

In addition to contributing their time and expertise, Herman and Lukash gave $25,000 to the Business, and "arranged for $75,000 of financing" from GCM and Strategic.[6]  *Id.* ¶ 32.  The funds provided by Herman and Lukash, in addition to funds provided by Ellins, Denkin, and Bianco, were used to retain various professionals who provided services and "developed assets" for the Business.  *Id.* ¶ 33.  This included attorneys, who advised the Five Individuals on the structure of the proposed Business and drafted documents to help raise money from investors; an engineer who created the drawings and renderings of the GrowBLOX product; an engineering firm that developed the mathematical algorithms for the product; and assistants that conducted research on legal cannabis, various licensing requirements, and other topics relevant to the Business.  *Id.*

Counterclaimants state that the Five Individuals all understood that they would not be compensated for their time "unless and until the Business was profitable," and agreed to contribute funds to support the Business until they were able to raise sufficient funds from

---

[6] GrowBlox Sciences attached seven promissory notes to the Amended Complaint. These notes document six loans from GCM to GrowOpp LLC totaling $65,000 and one loan from Strategic to GrowOpp LLC for $10,0000. Am. Compl., Exs. A-G. Each note contains a provision stating, in identical or similar terms, "[a]t the Lender's sole discretion, it may, in lieu of payment of the principal hereof, convert all or a portion of the total principal and interest due into shares of Common Stock of Digital Creative Development Corporation (DCDC) upon the consummation of a merger or similar transaction."  *See, e.g.*, Am. Compl., Ex. F at ¶ 6(b).

outside investors.  *Id.* ¶ 35.  Thus Herman and Lukash were not compensated for the time they spent working on the Cannabis Business, and "[t]hrough their expenditures, bore the risk of financial loss in the Five Individuals' venture."  *Id.* ¶ 36.

By contributing their expertise, time, and money, Herman and Lukash ultimately helped develop a variety of valuable assets for the Business.  *Id.* ¶ 37.  These assets included the GrowBLOX product and associated drawings and renderings; business plans; investor presentations; a website; a logo and other digital artwork; various intellectual property including the "GrowBLOX" name; research relating to the cannabis market, the hydroponics market, and government regulation of cannabis; and "other concepts, plans, and know-how relating to cannabis and hydroponics," (collectively, "Business Assets").  *Id.*

Counterclaimants state that the Five Individuals repeatedly referred to themselves as partners in emails and conversations, and that "third parties understood them to be partners."  *Id.* ¶ 38.  The Five Individuals allegedly "presented themselves as jointly associated with GrowOpp and/or Tumbleweed Holdings," and Denkin created email accounts for each of the Five Individuals using the domain name @growopp.com.[7]  *Id.*  Additionally, the Five Individuals opened at least two bank accounts into which they contributed funds "in furtherance of the Business."  *Id.*  Payments made by Herman and Lukash were either sent to a "GrowOpp" bank account or directly to the various professionals that the Business employed.  *Id.*

After the LOI expired on October 29, 2013, the Five Individuals contemplated transferring the Business Assets to a "capitalized public company," with each individual receiving equity in the public company.  *Id* ¶ 39.  Consistent with this plan, counsel to GrowOpp

---

[7] "GrowOpp" was the name that the Five Individuals were initially using for the Cannabis Business, before they discovered that "GrowOp" was already being used by a public company.  The Five Individuals subsequently changed the name to "Tumbleweed."

prepared a "Confidential Private Placement Memorandum," dated December 15, 2013 (the "PPM"). *See* Fleming Aff., Doc. 35, Ex. 1 ("PPM"). The PPM describes a private placement offering of shares of Tumbleweed Holdings, Inc. ("Tumbleweed"), a Delaware corporation. *Id.* The PPM states that 13,714,350 shares of Tumbleweed stock were outstanding and owned in equal amounts by the Five Individuals. *Id.* at 00004057; see also 2d Am. Countercl. ¶ 39. According to Counterclaimants, the PPM also indicated that Tumbleweed owned all of the assets developed by the Cannabis Business.[8] 2d Am. Countercl. ¶ 39.

The PPM also identifies Tumbleweed's "Executive Team," including Lukash as the company's Chief Executive Officer, Chief Operating Officer, and a Board Member; Denkin as the Vice President of Marketing and Sales; Bianco as the Business and Acquisition Advisor; and Ellins and Herman as Board Members of the corporation. *Id.* ¶ 40. Ellins and Denkin also sent investor presentations and business plans which, in sections entitled "Executive Leadership" and "Our Leadership Team," respectively, reiterated the individuals' roles at Tumbleweed described in the PPM. *Id.*

Tumbleweed Holdings, however, never became an operational entity, and notwithstanding the description in the PPM, no assets were transferred to Tumbleweed, no shares were issued, and no directors or officers were appointed. *Id.* ¶ 41. Counterclaimants explain that Tumbleweed was in fact "a proxy for the Partnership and its [a]ssets." *Id.* ¶ 42. More specifically, the Five Individuals allegedly understood that they had an equal stake in the

---

[8] The PPM does not explicitly state that Tumbleweed owned the assets of the Cannabis Business, though it does state that Tumbleweed controlled one hundred percent of GrowOpp LLC's "membership interests." PPM at 00005057. It is unclear if Counterclaimants are equating the membership interests of GrowOpp LLC to the Business Assets. However, Counterclaimants' allegation that Tumbleweed owned the Business Assets under the PPM is nonetheless taken as true, because it does not conflict with the text of the PPM. *See Mackley* 1999 WL 287362, at *3 n.2.

Cannabis Business, which after the capital-raising process would result in equal ownership in whatever entity was ultimately utilized to launch the Business. *Id.* The description in the PPM thus reflected the plan at that time to transfer the Business Assets, of which they were equal owners, into a capitalized public company such as "Tumbleweed," in return for which each of the five partners would receive equal shares of Tumbleweed stock. *Id.*

Although the transaction described in the PPM never occurred, on December 30, 2013, approximately two weeks after the date of the PPM, Lukash wrote to Ellins, Denkin, and Bianco, stating that "[i]t has been [my and Herman's] understanding we were all equal interest holders (20% each)." *Id.* ¶ 46. Denkin, that same day, responded via email, "OK." *Id.* ¶ 46.

Herman and Lukash continued to dedicate their time and resources to develop the Cannabis Business through early March 2014. *Id.* ¶ 47. Unbeknownst to Herman and Lukash, however, by at least January 2014, Ellins, Denkin, and Bianco, had begun to negotiate a sale of the Business Assets to GrowBlox Sciences, then known as Signature. *Id.* ¶ 49. On March 13, 2014, Ellins entered into an Asset Assignment, Acquisition and Professional Association Agreement with GrowBlox Sciences (the "Asset Sale Agreement"), which was filed with the SEC on March 19, 2014. *Id.* ¶ 50. Pursuant to the Asset Sale Agreement, Ellins purported to sell most, if not all, of the assets that were developed by Herman and Lukash for the Cannabis Business, including trademarks, patents, business plans, investor presentations and histories, websites, drawings and digital artwork, and reports. *Id.* The Asset Sale Agreement stated that the assets sold included assets "conceived, owned in whole or in part, or developed by Mr. Ellins or his associates." *Id.* ¶ 51.

None of Ellins, Denkin, or Bianco ever informed Herman or Lukash of their plans to sell the Business Assets to GrowBlox Sciences. *Id.* ¶ 60. Rather, Herman and Lukash learned of the

sale after GrowBlox Sciences filed an 8-K announcing the sale and annexing the Asset Sale Agreement.  *Id.*  Yet, Herman and Lukash had not given permission to Ellins, Denkin, or Bianco to sell the Business Assets.  *Id.* ¶ 61.  Furthermore, Herman and Lukash have never been compensated for their work for the Partnership or for developing the Business Assets that were sold to GrowBlox Sciences.  *Id.*

### B. Procedural Background

GrowBlox Sciences commenced this declaratory judgment action against GCM, Strategic, Lukash, and Herman on April 1, 2014.  *See* Compl., Doc. 2.  It filed an Amended Complaint on April 9, 2014.  *See* Doc. 3.  On May 9, 2014 , Defendants filed their Answer, which included counterclaims brought by themselves, along with DCDC, against GrowBlox Sciences, GrowOpp LLC, Ellins, Denkin, Bianco and Tumbleweed.  Countercl., Doc. 11.  Defendants filed Amended and Supplemental Counterclaims on November 19, 2014.  Am. Countercl., Doc. 26.  On June 2, 2014, this Court issued an Order granting in part and denying in part the motion to dismiss four of the five alleged Counterclaims, dismissing just the declaratory judgment and breach of fiduciary duty claims without prejudice.  Order, Doc. 44.

On July 1, 2015, Counterclaimants filed a motion for leave to file Second Amended Counterclaims.  Counterclaimants seek to replead the declaratory judgment and breach of fiduciary duty claims, and as an alternative to the breach of fiduciary duty claim, Counterclaimants seek to plead that Denkin and Bianco aided and abetted Ellins's breach of fiduciary duty.  Doc. 52; 2d Am. Countercl., Doc. 51-1.  On July 15, 2015, Counterclaim-Defendants filed an opposition to Counterclaimants' motion for leave to amend, Doc. 55, and on July 22, 2015, Counterclaimants filed a reply.  Doc. 60.

## II.   DISCUSSION

### A.   Motion for Leave to File Amended Counterclaims

Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that a party may amend its pleading with leave of the Court, and that "[t]he court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  The standard is generally a "permissive" one that is "consistent with [the Second Circuit's] strong preference for resolving disputes on the merits." *Williams v. Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011) (citation omitted).  However, where an amendment to a pleading would be futile, a motion for such relief should be denied. *Strougo v. Barclays PLC*, No. 14 Civ. 5797 (SAS), 2015 WL 1883201, at *5 (S.D.N.Y. Apr. 24, 2015) (denying leave to amend other than to correct inaccuracies in original pleading where court determined that further amendment to securities fraud pleading would be futile because alleged misstatements were not actionable).  Thus when an amendment would fail to withstand a motion to dismiss, the court "is justified in denying [the] amendment."  *Daniels v. Loizzo*, 174 F.R.D. 295, 299 (S.D.N.Y. 1997).

### B.   Rule 12(b)(6) Motion to Dismiss Standard

"A motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint."  *Revonate Mfg., LLC v. Acer Am. Corp.*, No. 12 Civ. 6017 (KBF), 2013 WL 342922, at *2 (S.D.N.Y. Jan. 18, 2013) (citation omitted).  When ruling on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).  The court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing *Twombly*, 550 U.S. at 551).  "To survive a motion to dismiss, a

complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.*  If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 680.

The question in a Rule 12 motion to dismiss "'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)).  "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits,'" and without regard for the weight of the evidence that might be offered in support of Plaintiffs' claims. *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (quoting *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006)).

The Court may consider a document that is attached to the complaint, incorporated by reference or integral to the complaint, provided there is no dispute regarding its authenticity, accuracy or relevance.  *DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 111 (2d Cir. 2010) (citations omitted).  "To be incorporated by reference, the [c]omplaint must make a clear, definite and substantial reference to the documents." *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 691 (S.D.N.Y. 2011) (internal quotation marks and citation

omitted).  The Proposed Second Amended Counterclaims cite and rely on two documents:  (1) the July 31, 2013 LOI and (2) the December 15, 2013 PPM.  *See* 2d Am. Countercl. ¶¶ 22-25, 39-46.  The LOI and PPM are clearly referenced by the Proposed Second Amended Counterclaims, are highly relevant to the question of whether the parties formed a partnership, and are therefore incorporated by reference.  Thus, the Court will consider them in deciding the present motion.

### C.  Request for Declaratory Relief

Counterclaimants seek a declaratory judgment stating that, "through their respective actions, a general partnership and/or joint venture was formed among Herman, Lukash, Ellins, Denkin, and Bianco, in which each individual owned an equal share."  2d Am. Countercl. ¶ 63.  Counterclaimants also seek a declaratory judgment stating that Herman and Lukash have a collective forty percent ownership stake in the partnership and that the assets sold pursuant to the Asset Sale Agreement were rightful assets of the partnership.  *Id*. at ¶¶ 69-70.  Counterclaim-Defendants argue that Counterclaimants have not alleged sufficient facts to evidence the existence of a partnership and/or joint venture.  Doc. 32 at 12-14.

#### 1.  Elements of a Partnership

"[A] [p]artnership results from contract, express or implied."  *Ronis v. Carmine's Broadway Feast, Inc*., No. 10 Civ. 3355 (TPG), 2012 WL 3929818, at *5 (S.D.N.Y. Sept. 7, 2012) (quoting *Martin v. Peyton*, 158 N.E. 77, 78 (N.Y. 1927)) (internal quotation marks omitted).  A partnership contract can be either oral or written.  *Id*. (citing *Missan v. Schoenfeld*, 95 A.D.2d 198, 208 (1983)).  Even in the absence of an explicit agreement, the existence of a partnership may be implied from "the conduct, intention, and relationship between the parties."  *Id*. (quoting *Brodsky v. Stadlen*, 138 A.D.2d 662, 663 (1988) (internal quotation marks omitted)).

Under New York law,[9] a partnership consists of four elements:  "(1) the parties' sharing of profits and losses; (2) the parties' joint control and management of the business; (3) the contribution by each party of property, financial resources, effort, skill, or knowledge to the business; and (4) the parties' intention to be partners."  *St.-Works Dev. LLC v. Richman*, No. 13 Civ. 774 (VB), 2015 WL 872457, at *4 (S.D.N.Y. Feb. 3, 2015) (internal citation and quotation mark omitted).  "Although none of these factors is determinative, some of them weigh more heavily than others," including the "indispensable" quality of a partnership that the parties agree to share losses.  *Ardis Health, LLC v. Nankivell*, No. 11 Civ. 5013 (NRB), 2012 WL 5290326, at *5 (S.D.N.Y. Oct. 23, 2012) (citing  *Steinbeck v. Gerosa,* 151 N.E.2d 170, 178 (N.Y. 1958)).

The Proposed Second Amended Counterclaims refer to the existence of a joint venture interchangeably with the existence of a partnership.  *See* Doc. 36 at 1, 4, 13.  Under New York law, partnerships and joint ventures are virtually identical.  Doc. 32 at 14 n.9.  Indeed, a joint venture is viewed as a "partnership for a limited purpose," and is "governed by the same legal rules as partnerships."[10]  *Scholastic, Inc. v. Harris*, 259 F.3d 73, 84 (2d Cir. 2001) (internal citations omitted); *see also Turner v. Temptu Inc*., 586 F. App'x 718, 719 n.2 (2d Cir. 2014) (citing *Scholastic* to justify the use of both terms in referring to the same arrangement); *Ely v. Perthuis*, No. 12 Civ. 1078 (DAB), 2013 WL 411348, at *4 n.2 (S.D.N.Y. Jan. 29, 2013) ("[A]t times[,] joint venture[s] and partnership[s] have been discussed nearly interchangeably.").

---

[9] Based on their briefing, the parties agree that New York law applies.  Doc. 52 at 12; Doc. 55 at 2.

[10] A joint venture consists of:  (1) "two or more parties entered an agreement to create an enterprise for profit," (2) "the agreement evidences the parties' mutual intent to be joint venturers," (3) "each party contributed property, financing, skill, knowledge, or effort to the venture," (4) "each party had some degree of joint management control over the venture," and (5) "there was a provision for the sharing of both losses and profits."  *Kidz Cloz, Inc. v. Officially For Kids, Inc*., 320 F. Supp. 2d 164, 171 (S.D.N.Y. 2004) (internal citations omitted).

### 2.  Application to the Pleadings

The Court finds that Counterclaimants have plausibly alleged the existence of a partnership amongst the Five Individuals.

First, Counterclaimants have clearly alleged that the Five Individuals each made contributions of "property, financial resources, effort, skill, or knowledge" to the Cannabis Business.  Herman and Lukash worked with Ellins, Denkin, and Bianco to create a business plan, create pro-forma financials, develop the corporate website, create investor presentations, and raise financing.  2d Am. Countercl. ¶ 30.[11]  Lukash also contributed his experience managing various technology and software companies to assist in developing the GrowBLOX product. This involved transforming the product from "a rudimentary prototype built of out of wood to a commercially-marketable product complete with sophisticated technologies."  *Id.* ¶ 29. Furthermore, Lukash consulted with Ellins regularly on the product and made recommendations on the product's construction, design, and packaging.  *Id.*

Herman and Lukash also contributed over $25,000 to the Business.[12]  *Id.* ¶ 32. Counterclaimants explain that these funds were used to retain various professionals including attorneys, who advised the Five Individuals on the structure of the proposed Business and drafted documents to help raise money from investors; an engineer who created the drawings and renderings of the GrowBLOX product; an engineering firm that developed the mathematical

---

[11] Counterclaimants further allege that Herman took "all necessary steps" to deliver a "clean" public shell, in the form of DCDC to serve as the public acquisition vehicle for the Cannabis Business.  2d Am. Countercl. ¶ 31. However, they do not specify what these "steps" entailed, nor does it appear that DCDC was ever actually used as a public shell for the Business.

[12] Counterclaimants allege that Herman and Lukash also "arranged for $75,000 of financing" from GCM and Strategic.  *Id.* ¶ 32.  To the extent that Counterclaimants are referring to the promissory notes attached to Plaintiff's Amended Complaint, the Court has already found in a previous Order that these are not "investments," but loans requiring repayment of the principal sum plus interest.  *See* Order, Doc. 44 at 15 n.17; Am. Compl., Exs. A-F.

algorithms for the product; and assistants that "conducted research on legal cannabis, various licensing requirements, and other topics relevant to the Business." *Id.* ¶ 33.[13] The Court finds that these allegations are sufficient to satisfy the contribution element of a partnership. *See Matlins v. Sargent*, No. 86 Civ. 0370 (MJL), 1991 WL 79219, at *4 (S.D.N.Y. May 7, 1991) (finding that defendant's "$3500 capital contribution . . . bolsters the presumption of partnership")**.**

The Court also finds that Counterclaimants have sufficiently alleged "the parties' intention to be partners." Counterclaimants allege that all five individuals agreed from the outset to each be 20% owners of the Cannabis Business and to share equally in its profits. 2d Am. Countercl. ¶ 27. Furthermore, Counterclaimants allege that throughout the time that they worked together, the Five Individuals repeatedly referred to themselves as partners, and third parties understood them to be partners. This understanding was allegedly confirmed in an email dated December 30, 2013, two months after the expiration of the LOI, when Lukash wrote to Ellins, Denkin, and Bianco, stating that "[i]t has been [my and Herman's] understanding we were all equal interest holders (20% each)." *Id.* ¶ 46. Denkin confirmed that Lukash's understanding was correct in an email later that day, by responding "OK." *Id.*

While Counterclaim-Defendants are correct to point out that simply "calling an organization a partnership does not make it one," *Kidz Cloz, Inc. v. Officially for Kids, Inc.*, 320

---

[13] Counterclaim-Defendants argue that Counterclaimants "failed to connect" their $25,000 contribution to any specific benefit to the partnership, and that "there is no practical way of discerning from the face of the [proposed pleading] whether the $25,000 was in fact used for partnership purposes or some other purpose." Plaintiff/Counterclaim Defendants' Memorandum in Opposition to Counterclaimants' Motion for Leave to Serve and File Second Amended Counterclaims ("Countercl. Def. Br."), Doc. 55, at 5. However, the pleading expressly alleges that Herman and Lukash "provided more than $25,000 *to support the Five Individuals' ongoing efforts to develop the Business*," and that these funds "were used to, among other things, retain various professionals who provided services and developed assets for the Business," and "to develop a variety of valuable assets for the Partnership." 2d Am. Countercl. ¶¶ 32, 33, 37 (emphasis added).

F. Supp. 2d 164, 174 (S.D.N.Y. 2004) (citation omitted), the Five Individuals' actions also evinced an intention to be partners.  Denkin created email accounts for each of the Five Individuals using the domain name @growopp.com, with "GrowOpp" referring to the working name of the Cannabis Business.[14]  2d Am. Countercl. ¶ 38.  The Five Individuals also opened at least two bank accounts into which they deposited funds in furtherance of the Business.  *Id.* ¶ 38.

Perhaps most significant are the LOI and PPM.  Both documents demonstrate that the Five Individuals contemplated that they would transfer the assets of the Cannabis Business to a capitalized public company.  *Id.* ¶ 39.  In return, the Five Individuals would each receive an equal amount of equity in the resulting corporation.  *Id.*  Although neither transaction came to pass, the LOI and PPM indicate that the Five Individuals believed they were each entitled to an equal reward for the Business Assets, which they are alleged to have jointly developed and owned.[15]

The Court thus finds that Counterclaimants' allegations in conjunction with the LOI and PPM sufficiently evince an intention by the Five Individuals to be partners.

The Court also finds that the Five Individuals' intention to split the equity they would receive upon transferring the Business Assets to a public company corroborates

---

[14] Counterclaim-Defendants argue that the creation of the @growopp.com email accounts for the Five Individuals fails to demonstrate any intention to be partners, because other people involved with the Cannabis Business, including employees and independent contractors, were given the same domain name.  Countercl. Def. Br. at 7. However, the Court need not give any weight to Counterclaim-Defendants factual assertions for the purpose of this motion.

[15] Counterclaim-Defendants claim that the assets of the Cannabis Business were owned by GrowOpp LLC, and that Herman and Lukash never had an ownership interest in GrowOpp, LLC or its assets.  Countercl. Def. Br. at 8-9. However, for the purpose of this motion, the Court must accept Counterclaimants' factual allegations as true, *Nielsen*, 746 F.3d at 62, and Counterclaimants have clearly alleged that the Five Individuals were equal owners of the Business Assets, and that the Assets were the product of each of their efforts and financial contributions.  2d Am. Countercl. ¶¶ 37, 42.

Counterclaimants' allegation that the parties undertook to share in the profits and losses of the Business. *Id.* ¶ 27. *Cf. SCS Commc'ns, Inc. v. Herrick Co.*, 360 F.3d 329, 342 (2d Cir. 2004) (finding that where parties formed joint venture to acquire a business, the "sharing of profits and losses" was established by "[t]he anticipated equal ownership" of the to-be-acquired business); *see also Brown v. Cara*, 420 F.3d 148, 160 (2d Cir. 2005) (defendants' argument that "joint ownership is sufficient to demonstrate an agreement to share losses . . . would be compelling" if the parties' agreement contemplated equal ownership of a real estate development project); *Burde v. C. I. R.*, 352 F.2d 995, 1002 (2d Cir. 1965) (finding parties' plan to develop and sell a product and then "divide the proceeds of sale into three equal parts" supported conclusion that they formed a partnership).

Herman and Lukash's agreement to share in the losses of the Cannabis Businesses is further demonstrated by the understanding that their contributions would only be compensated by the Business if and when it was profitable.  2d Am. Countercl. ¶ 35.  Counterclaim-Defendants contend that "a putative joint venturer who only stands to lose the value of his or her services rendered in connection with the venture does not submit himself or herself to the liabilities and losses of the venture and thus is not considered a joint venturer." *Cosy Goose Hellas v. Cosy Goose USA. Ltd.*, 581 F. Supp. 2d 606, 620-21 (S.D.N.Y. 2008) (citing *Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 68 (2d Cir. 2003)).  Counterclaimants, however, don't merely allege that Herman and Lukash contributed their services without the expectation of pay. They also allege that Herman and Lukash contributed money to the Business, understanding that they would only recover their investment if the Business succeeded.

As to the final element of a partnership, the Court finds that Counterclaimants have sufficiently pleaded that the parties had "joint control and management of the business."

18

Counterclaimants allege that the Five Individuals routinely consulted one another on "all decisions affecting the Business," including changing the name of the Business and the style of the logo. 2d Am. Countercl. ¶ 34. Counterclaimants also argue that joint control and management is reflected in the PPM and associated investor materials created by the Five Individuals, which indicate that the parties were all to serve on the executive board of the entity used to acquire the Business Assets.[16] *Id.* ¶ 40. The Court finds that while these factual allegations do not provide particularly strong support for a finding of "joint control and management," at this stage of the pleadings, and in conjunction with the other partnership elements—which Counterclaimants have clearly alleged—the existence of a partnership and/or joint venture could reasonably be found.[17]

For these reasons, the Court grants Counterclaimants' motion for leave to plead the declaratory judgment claim.

---

[16] These materials indicate that Lukash was to be the Chief Executive Officer, Chief Operating Officer, and a Board Member; that Denkin was to be the Vice President of Marketing and Sales; that Bianco was to be the Business and Acquisition Advisor; and that Ellins and Herman were to be Board Members. 2d Am. Countercl. ¶ 40.

[17] Counterclaim-Defendants argue that Counterclaimants' contention that Herman and Lukash shared joint ownership and control of the alleged partnership is undermined by Lukash's deposition testimony, which Counterclaim-Defendants have excerpted and attached to their opposition brief. Countercl. Def. Br. at 8. The Court need not consider this testimony, however, because it is not attached or otherwise incorporated by reference in the pleadings. *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (finding that generally, in deciding a motion to dismiss, the court may only consider facts stated in the complaint or "[d]ocuments that are attached to the complaint or incorporated in it by reference"); *see also Res. Mine, Inc. v. Gravity Microsystem LLC*, No. 09 Civ. 0573 (DRH), 2014 WL 7011074, at *3 n.1 (E.D.N.Y. Dec. 11, 2014) ("Since the document at issue is not attached to the [proposed amended complaint] or incorporated in it by reference, the Court will not consider it in its analysis" of the motion to amend). Even if the Court were to consider Lukash's testimony, however, it in no way undermines Counterclaimants' assertion that the Five Individuals exercised joint ownership and control of the Business. The deposition excerpt indicates that Lukash stated that he would not "be able to make on behalf of all the partners a commitment to buy a car." Countercl. Def. Br., Ex. B. There is no indication in the context of the excerpt (or in this case), however, that buying a car was within the scope of the Cannabis Business's activities. *See* N.Y. P'ship Law § 20(2) ("An act of a partner which is not apparently for the carrying on of the business of the partnership in the usual way does not bind the partnership unless authorized by the other partners.").

**D.  Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary Duty**

Counterclaimants' second cause of action alleges that Counterclaim-Defendants breached their fiduciary duties of care and loyalty to the general partnership and to their partners when they transferred the Business Assets to GrowBlox Sciences without informing or obtaining the consent of Herman and Lukash.  2d. Am. Countercl. ¶ 73.  In the alternative, Counterclaimants allege that Denkin and Bianco aided and abetted Ellins's breach of his fiduciary duties.  *Id.* ¶ 74.  Because Counterclaimant-Defendants do not provide any reasoning to challenge these claims, and because the Court finds that they have been plausibly alleged, Counterclaimants' are granted leave to plead counterclaims for breach of fiduciary duty and for aiding and abetting breach of fiduciary duty.

**III.   CONCLUSION**

For the reasons set forth above, Counterclaimants' motion to amend is GRANTED.  The Clerk of the Court is respectfully directed to terminate the motion, Doc. 50.

It is SO ORDERED.

Dated:    March 31, 2016
          New York, New York

Edgardo Ramos, U.S.D.J.

20